**UNDER SEAL**          **UNDER SEAL**          **UNDER SEAL**

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

FEB 2 3 2011

JAMES R. LARSEN, CLERK
_____DEPUTY
SPOKANE, WASHINGTON

**SEALED**

Stephani L. Ayers WSBA #31610
T.M. Guyer and Ayers & Friends, P.C.
116 Mistletoe St.
P.O. Box 1061
Medford, OR 97501
Ph: 813 382 7865
Fax: 1.888.866.4720
Email: Stephani@whistleblowerdefenders.com

Geoffrey Bestor, Esq. *Pro hac vice forthcoming*
4204 Maple Terrace
Chevy Chase, MD 20815
240-463-8503
gbesq@bestorlaw.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF WASHINGTON
### RICHLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* <br> LOYDENE RAMBO, <br><br> Plaintiff, <br><br> v. <br><br> FLUOR HANFORD, LLC; FLUOR CORPORATION; MISSION SUPPORT ALLIANCE, LLC; LOCKHEED MARTIN INTEGRATED TECHNOLOGY, LLC; JACOBS TECHNOLOGY; WACKENHUT SERVICES, INC.; CONGRESSIONAL STRATEGIES, LLC; SECURE HORIZONS, LLC., <br><br> Defendants. | Case No. <br> **CV-11-5037-WFN** <br> **COMPLAINT** <br> **FILED EX PARTE** <br> **AND UNDER SEAL** <br><br><br> Jury Trial Demanded |

COMPLAINT -                               1

## INTRODUCTION

1.     Loydene Rambo ("Relator") brings this action on behalf of the United States of America against Defendants Fluor Hanford, LLC; Fluor Corporation; Mission Support Alliance, LLC; Lockheed Martin Integrated Technology, LLC; Jacobs Technology; Wackenhut Services, Inc.   Relator sues Defendants for treble damages and civil penalties arising from the Defendants' conduct in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA").  The violations arise out of requests for payment by the United States Department of Energy based on false claims.

2.     This Complaint describes Defendants' use of appropriated funds to influence officers and employees of federal agencies, members of Congress, and their staff, in connection with the award and extension, continuation, renewal, amendment, or modification of federal contracts in violation of 31 U.S.C. § 1352.  Defendants made claims for payment, and were paid, after falsely certifying compliance with 31 U.S.C. § 1352, thereby violating the False Claims Act.

3.     As required by the FCA, 31 U.S.C. § 3730(b)(2), the Relator has provided to the Attorney General of the United States and the United States Attorney for the Eastern District of Washington, simultaneous with and/or prior to the filing of this Complaint, a statement of all material evidence and information related to the Complaint.  This disclosure statement is supported by material evidence known to

COMPLAINT -                              **2**

Relator at the time of her filing, establishing the existence of the Defendants' legal responsibility for the false claims.  Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

4.  Relator bring this action based on her direct knowledge and also on information and belief.  None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4).  Relator is an original source of the facts alleged in this Complaint.

## JURISDICTION AND VENUE

5.  The federal contracts at issue here were entered into in the Eastern District of Washington,  and concerned services to be provided in located in the Eastern District of Washington and/or to parties located in the district.  The false claims proscribed by 31 U.S.C. S 3729 *et seq.*, and complained of herein occurred in the Eastern District of Washington.  Defendants either do business, or provided services to other Defendants doing business, in the Eastern District of Washington.  Therefore, this Court has jurisdiction over this case and all Defendants pursuant to 31 U.S.C. 3732 (a), as well as under 28 U.S.C. § 1345.

COMPLAINT -                            3

UNDER SEAL                    UNDER SEAL                    UNDER SEAL

6. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the false claims proscribed by 31 U.S.C. §3729 *et seq.*, occurred in this District and is also proper pursuant to U.S.C. §1391(b) because the claims that this Complaint describes arose in this District. Further, the Defendants do business, or provided services to other Defendants doing business, in this District.

## PARTIES

11. Relator, Loydene Rambo, is a resident of Richland, Washington. From November 2001 until August 24, 2009, Relator was employed by Defendant Fluor Hanford. From August 24, 2009 to July 2010, Relator was employed by Defendant Mission Support Alliance. These Defendants had the ability to affect the terms and conditions of Relator's employment and were able to control and direct the Relator in her work activities.

12. Defendant Fluor Hanford, Inc., constructed and operated the Volpentest HAMMER Training & Education Center, located north of Richland, Washington, from 1996 through August 23, 2009. Fluor Hanford is incorporated in the State of Washington. On information and belief, Fluor Hanford is a wholly-owned, indirect subsidiary of Defendant Fluor Corporation, a Delaware Corporation. Fluor Corporation characterizes Fluor Hanford, Inc., as a "business unit of Fluor Corporation." http://fluorhanford.net/a_history.html.

13.     Defendant Fluor Corporation is a Delaware Corporation.  Fluor Corporation operates in this District through its wholly-owned, indirect subsidiary Fluor Hanford, LLC.

14.     Lockheed Martin Integrated Technology, LLC ("Lockheed"), is a Delaware corporation.  Lockheed is a member of Defendant Mission Support Alliance, LLC.  For purposes of the Hanford Site prime contract, Lockheed's principal place of business is in Richland, Washington.

15.     Jacobs Engineering Group, Inc. ("Jacobs") is a Delaware corporation. Jacobs is a member of Defendant Mission Support Alliance, LLC.  For purposes of the Hanford Site prime contract, Jacob's principal place of business is in Richland, Washington.

16.     Wackenhut Services, Inc. ("Wackenhut"), is a Florida corporation. Wackenhut is a member of Defendant Mission Support Alliance, LLC.  For purposes of the Hanford Site prime contract, Wackenhut's principal place of business is in Richland, Washington.

17.     Defendant Mission Support Alliance, LLC ("MSA"), is a Delaware limited liability company, with its principal place of business in Richland, Washington.  The three members of MSA are Lockheed, Jacobs, and Wackenhut.  MSA has operated the Volpentest HAMMER Training & Education Center since August 24, 2009.  All further

references to MSA in this Complaint should be understood to include MSA, Lockheed

Martin Integrated Technology, LLC, Jacobs Engineering, Inc., and Wackenhut Services,

Inc., collectively.

18.     Defendant Congressional Strategies, LLC, is a Virginia limited liability

company with its principal place of business in Alexandria, Virginia.

19.     On information and belief, Defendant Secure Horizons Consulting, LLC, is

a Virginia limited liability company with its principal place of business in Alexandria,

Virginia.

## LAWS

20. The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent
claim for payment or approval; (B) knowingly makes, uses, or causes to be
made or used, a false record or statement material to a false or fraudulent
claim; . . . is liable to the United States Government for a civil penalty of
not less than $5,000 and not more than $10,000, as adjusted by the Federal
Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note;
Public Law 104-410), plus 3 times the amount of damages which the
Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

21.     The False Claims Act is the government's primary tool to recover losses

due to fraud and abuse by those seeking payment from the United States. *See* S. Rep.

No. 345, 99 Cong., 2nd Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N 5266.

COMPLAINT -                              6

22.     The Byrd Amendment, 31 U.S.C. § 1352(a), prohibits, among other things, using federally appropriated funds paid by the United States pursuant to a federal contract "to pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with any [listed] Federal action." 31 U.S.C. § 1352(a)(1).  "Federal actions" include the making and extension, continuation, renewal, amendment, or modification of any federal contract. 31 U.S.C § 1352(a)(2).  The Byrd Amendment also requires a certification on the part of contract awardees that they have not and will not use federal money in a manner prohibited by the Act. 31 U.S.C. § 1352(b).

23.     Submission of a claim for payment under a federal contract falsely certifying compliance with the Byrd Amendment constitutes a violation of the False Claims Act.

## ALLEGATIONS

### 1. HAMMER and the Defendants' DOE Contracts

24.     Volpentest HAMMER Training & Education Center ("HAMMER") is located on the United States Department of Energy's Hanford Site just north of Richland, Washington.  HAMMER, which is an acronym for "Hazardous Materials Management

COMPLAINT –                              7

and Emergency Response," is a federally-funded training center whose primary mission

is to provide training for Hanford workers engaged in environmental cleanup activities.

25.    In addition to its primary mission, HAMMER contracts with emergency

response agencies to offer classes in areas such as fire suppression, hostage rescue, high-

speed pursuit, and drug enforcement.  HAMMER has also contracted with the U.S. State

Department to train international border patrol agents and homeland security personnel.

All of these activities are paid for by federal appropriations.

26.    The Department of Energy ("DOE") contracts with private companies to

operate the Hanford site, including HAMMER.  Defendants Fluor Hanford, Inc., and

Fluor Corporation (collectively "Fluor") operated HAMMER from its opening in 1997

through August 23, 2009.  In 2009, DOE awarded the Hanford Site support and

infrastructure contract, including the management of HAMMER, to MSA.  After several

months of transition, MSA assumed management of HAMMER on August 24, 2009.

27.    The contracts to run HAMMER were part of the larger contracts between

DOE and Fluor, and then MSA, for Fluor and MSA to serve as prime contractors for the

Hanford Site.  These contracts were funded through appropriations for DOE.

28.    Karen McGinnis has served as the Director of HAMMER since its

inception.  She was an employee of Defendant Fluor Hanford during the period Fluor

Hanford was contracted to run HAMMER.  McGinnis became an employee of MSA on

COMPLAINT -                                    8

August 24, 2009. Defendants' payment of McGinnis's salary and expenses were

reimbursed pursuant to the contracts with DOE and were thus ultimately paid with DOE

appropriations.

29.    Gary Karnofski has been employed by HAMMER since at least 1997. He

was a Training Program Manager at HAMMER until May 2008, when he was promoted

to manager of the Strategic Planning and Business Management. He was an employee

of Defendant Fluor Hanford during the period Fluor Hanford was contracted to run

HAMMER. Karnofski became an employee of MSA on August 24, 2009. Defendants'

payment of Karnofski's salary and expenses were reimbursed pursuant to the contracts

with DOE and were thus ultimately paid with DOE appropriations.

### 2.    Relator's Position and Duties at HAMMER

30.    Relator Loydene Rambo was employed at HAMMER beginning in 1997.

From 2001 to 2009, she was employed by Defendant Fluor Hanford. She became an

employee of Defendant MSA when MSA took over the HAMMER facility in 2009.

Because of the events set forth in this Complaint, Relator left HAMMER effective July

29, 2010, to take a position with another company.

31.    Relator has over 26 years of experience working with DOE contracts.

Relator was the Buyers Technical Representative for HAMMER. Relator's

responsibilities as the Buyer's Technical Representative ("BTR") for HAMMER

involved:

- preparation of the statement of work and supporting documentation for HAMMER and Hanford Training contracts;
- documentation of contracts in the Hanford Site Passport contracts and accounting database system;
- verification of funding availability and confirmation of the charge code(s) for the contract;
- verification of services performed and electronic approval of the invoices for payment;
- preparation of contract modifications;
- notification of completion all deliverables on the contract; and
- resolution of technical contractual issues and clarification of work scope if needed.

32.    During a fiscal year, Relator usually initiated and performed BTR duties for

100 - 180 contracts for HAMMER and Hanford Training.  Relator was responsible for

ensuring that all contracts for operations and training at HAMMER were active and in

place prior to the start of each fiscal year to minimize any possible disruptions of

service.

33.    During the period 2005 to 2008, Relator's direct supervisor was Nadine

Highland, manager of the Strategic Planning and Business Management organization

within HAMMER and Hanford Training.  Ms. Highland reported to Karen McGinnis,

the Director of HAMMER and Hanford Training.  Gary Karnofski was a Training

Program Manager at HAMMER until May 2008 when Ms. Highland retired.  Upon Ms.

Highland's retirement, Karnofski was promoted to her position and from that time

Relator reported directly to Karnofski who, in turn, reported directly to McGinnis.

### 3.    The Hiring of CS and SHC

34.    HAMMER was designated as a "user facility," allowing non-DOE Hanford

Site entities to use HAMMER for training on a cost reimbursement basis.  That

designation allowed HAMMER to market excess training capacity to first responders,

the military, and other non-DOE government agencies such as the Federal Law

Enforcement Training Center ("FLETC").

35.    In order to grow, HAMMER marketed its training services.  In the early

years, the marketing was directed to local and regional first responders such as the

Seattle Fire Department.  However, these efforts were not as financially successful as

planned.  In 2005, HAMMER decided to market its training services to national

programs such as the National Guard Bureau ("NGB") of the Department of Defense

and FLETC.  FLETC training needs had expanded significantly after 9-11, and FLETC

was looking for western U.S. training sites for western U.S. first responders.   With the

increase of possible biological and chemical weapon threats, NGB was looking for

avenues to train its Civil Support Teams ("CSTs") in hazardous response to potential

domestic incidents.

36.     HAMMER management's desire to market its training capabilities to national entities such as NGB and FLETC led directly to the hiring of Defendants Congressional Strategies ("CS") and Secure Horizons Consulting ("SHC"). During a visit in 2005 by Karen McGinnis to Washington, D.C., to seek out training business for HAMMER, McGinnis met Carolyn Hanna Alsup of SHC.  Shortly thereafter, McGinnis directed Relator to prepare a requisition to initiate a contract for HAMMER to hire SHC.

37.     Several months later, Alsup introduced McGinnis to Grayson Winterling of CS.  Alsup and SHC were, and are, associates of CS (CS's website lists them as "associates").  McGinnis thereupon directed Relator to prepare a requisition to initiate a contract for HAMMER to hire CS as well.

### 4.     The CS and SHC Contracts with HAMMER

38.     The first contract between HAMMER and SHC, contract number 26527-1, ran from March 29, 2005, to September 30, 2006.  The contract was later extended under number 30364 from October 1, 2006, through September 20, 2010.  The statement of work for original SCH contract 26527-1 was as follows:

> The contractor shall provide support to HAMMER for tasks which include but are not limited to the following:
>
> 2a. Assist HAMMER in the development and implementation of a strategy to demonstrate HAMMER capabilities to senior officers within the National Guard, Department of Defense, Department of Homeland Security and Department of Energy including key decision makers.

COMPLAINT -                                    12

2b. Support the development of strategies for networking with key decision-makers in the National Guard Bureau and National Guard units, Department of Defense, Department of Homeland Security as well as Department of Energy to obtain support for HAMMER initiatives.

2c. Assist in the development of a strategy for sustaining the relationships and networking with key decision makers within the federal agencies identified above.

2d. Support efforts to increase national exposure of HAMMER facility capabilities and potential partnership opportunities with the objective of expanding the HAMMER user base and reducing DOE-EM costs.

2e. Provide assistance in the preparation of documents in support of various funding sources and programs for which HAMMER provides or could provide the necessary training.

The workscope may involve travel such as:
- Trips to HAMMER for consultations and meeting customers
- Trips to partnering facilities or to meet with key decision makers

Deliverables will be managed and coordinated through Karen McGinnis, Director of HAMMER at 509-376-9403.

39.    The statement of work for the follow-on SCH contract 30364 was as

follows:

Contractor shall provide support to HAMMER for tasks which include, but are not limited to, the following:

Support the development of strategies for networking with key decision-makers in the National Guard Bureau and National Guard units, Department of Defense, Department of Homeland Security, as well as Department of Energy to obtain support for HAMMER initiatives.

Assist in the development of strategy for sustaining the relationships and networking with key decision makers within the federal agencies identified above.

Support efforts to increase national exposure of HAMMER facility capabilities and potential partnership opportunities with the objective of expanding the HAMMER user base and reducing DOE-EM costs.

Provide assistance in the preparation of documents in support of various funding sources and programs for which HAMMER provides or could provide necessary training.

The workscope may involve travel such as:
- Trips to HAMMER for consultations and meeting customers
- Trips to partnering facilities or to meet with key decision makers

Deliverables will be managed and coordinated through Karen McGinnis, Director of HAMMER at 509-376-9403.

40.    Karen McGinnis provided the exact wording for the statement of work for these contracts. Of the hundreds of contracts that Relator initiated during her tenure at HAMMER, this contract, and the CS contract, were two of the few contracts for which someone else wrote the statement of work.

41.    The first contract between HAMMER and CS, contract number 27659, ran from August 11, 2005, to September 30, 2006. The contract language was extended under number 30390 from October 1, 2006 through September 20, 2010. The reason for the different contract numbers on both the CS and SHC contracts is discussed below. Karen McGinnis also provided the specific wording for the statement of work for the

original CS contract 27659 (the language was repeated in the second contract), which

provided as follows:

> The contractor shall provide support to HAMMER for tasks which include, but are not limited to, the following:

> 2a, Assist HAMMER in the development of a strategy to demonstrate HAMMER capabilities to senior officers and key decision makers in the National Guard, at the state and national level, including the National Guard Bureau and the Department of Defense.

> 2b. Support the development of strategies for contacting and networking with key decision makers in the National Guard Bureau and National Guard state units, the Department of Defense, and the Department of Homeland Security to obtain support for HAMMER initiatives.

> 2c. Support identifying training requirements and opportunities for other military units responsible for domestic civil support.

> 2d. Assist the development and identification of enhanced training approaches, techniques, and technologies to provide training to National Guard response teams and to all levels of first responders.

> 2e. Provide assistance in the preparation of documents in support of various funding sources and programs for which HAMMER provides or could provide the necessary training or exercise programs.

> This work scope will involve one trip to HAMMER and other travel as identified and approved by Fluor Hanford/HAMMER management.  Tiered subcontracts to others by the contractor are permitted and all contractual terms and conditions will apply.

> Specific deliverables will be managed and coordinated through Karen McGinnis, Director of HAMMER at 509-376-9403.

UNDER SEAL          UNDER SEAL          UNDER SEAL

42.    The CS and SHC contracts thus on their face involved lobbying the legislative and executive branches of the federal government for additional funds for HAMMER through appropriations and contracts.  The fact that this was the purpose of the contracts is reinforced by the stated business of CS according to its website.  An archived version of CS's 2005 website can be found at:

http://web.archive.org/web/20050404222117/http://www.congressionalstrategies.com/.

That website described CS as follows:

> Congressional Strategies is a Washington based consulting firm specializing in the development and implementation of a tailored congressional strategy, designed to achieve our client's business development and financial goals.
>
> Our clients consist of both large and small companies interested in or currently engaged in doing business with the federal government, primarily the Department of Defense.

43.    The principal of CS is Grayson Winterling.  He described himself on CS's 2005 website as follows:

> Grayson is a principal and co-founder of Congressional Strategies, LLC. His seventeen years of experience with the executive and legislative branches of government provide him with keen insight into the congressional budget process, as well as the key players involved. Prior to forming his own firm, he was president of an international consulting firm where he developed marketing and legislative plans for domestic and foreign companies interested in conducting business in the US defense sector.

44.    CS's 2005 website described a four-phase process, extended over three to five years, that it undertakes with its clients.  Every phase is part of a lobbying strategy to get money from Congress.  Some examples of CS's "four-phase process:"

COMPLAINT -                                16

Research/Analysis:  We begin the research and analysis phase engaging in detailed discussions with company representatives to acquire a general overview of the company and a specific understanding of the task, which is generally adding money and/or policy language to congressional legislation.

Plan Development:  The plan development phase blends the outcome of the initial analysis with congressional options. On the congressional side, Members of Congress are selected as potential advocates based on our knowledge of their interests and expertise, their voting record, floor statements, committee assignments, and the geographical location of their congressional district.

Plan Execution:  Phase III, plan execution, coincides directly with the legislative calendar and lasts approximately 8 months. As we execute our planned strategy, in addition to the scheduled meeting, we maintain close contact with the selected members and key staff. This contact is maintained not only in the work place, but also during various Washington social functions.

45.    Phase IV is even called "Program Funding."  CS's 2005 website describes

this phase as follows:

Phase IV, program funding or in generic terms, release of congressionally added money by the executive department to the specific program manager, is a critical phase.

Traditionally, without a thorough plan, which includes appropriate leverage, congressionally added money can languish in the comptroller's office from 6 to 9 months, and on some occasions never be released. Congressional Strategies plans for this phase from the beginning, and works for the release of the money prior to passage of the bill.

46.    Relator served as BTR for the CS and SHC contracts from their inception

until Relator left HAMMER in 2010.  Because Relator was concerned from the outset

about the nature of the work to be performed under the contracts, and the possibility that

the work might fall under the proscriptions of the Byrd Amendment and the

requirements of Fluor's contract with DOE, Relator, with the support of the manager of

the Business Management and Strategic Planning, included a requirement in each

contract of monthly submission of a description of work performed.  Relator was told

after the award of the first SHC contract was signed that McGinnis had instructed Alsup

to submit vague work descriptions to avoid creating a strong paper trail.

### 5.    Transfer of the CS and SHC Contracts from Fluor to MSA

47.    As early as 2006, DOE began the process of recompeting the prime

contracts for the Hanford Site.  In 2009, DOE awarded one of the prime contracts to

MSA.  On April 28, 2009, Defendants Lockheed, Jacobs, and Wackenhut entered into a

contract with DOE to replace Fluor, including taking over operation of HAMMER.

While the three companies operate under the banner of the Mission Support Alliance,

LLC, MSA is not a signatory to the contract with DOE.

48.    On August 24, 2009, HAMMER's employees transferred to the employ of

MSA. The CS and SHC contracts were also transferred to MSA.  At that point, the CS

and SHC contracts ran through September 30, 2010.

### 6.    The Nature of the Work Performed by CS and SHC

49.    The CS and SHC invoices and their accompanying work descriptions are

submitted with this complaint and are incorporated as if fully set forth herein.  The

COMPLAINT -                             **18**

invoices were paid for entirely with DOE and DOD appropriated funds. The work

descriptions are replete with attempts to influence officers or employees of federal

agencies, Members of Congress, officers or employees of Congress, or employees of a

Member of Congress in connection with the making and extension, continuation,

renewal, amendment or modification of federal contracts.

50.     The description of work make it clear that the only job of CS and SHC was

to solicit contracts from the NGB, FLETC, and other federally-funded entities and

programs, and from Congressional appropriators. Every single CS description of work

describes attempts to get more business from NGB, either directly or through the

appropriations process. Every single SHC description of work reflects meetings and

telephone calls with federal officials, the sole purpose of which was to gin up more

business for HAMMER.

51.     Carolyn Hanna Alsup, and her company, SHC, were hired to get business

from the Department of Homeland Security. This is clear from the very first invoice for

services rendered sent by Alsup to HAMMER, dated May 2, 2005. The description of

work accompanying the invoice contains several entries describing Alsup's efforts to

arrange meetings for HAMMER with DHS. In addition, the description of work

contains the following entry:

> Meeting w/Madelyn Creedon to ascertain background on HAMMER
> legislative initiatives and defense authorization report language.

COMPLAINT –                              **19**

Madelyn Creedon was then, and remains, counsel to the Senate Armed Services

Committee.

52.    Just as clearly, Grayson Winterling, and his company CS, were hired to

solicit contracts from the National Guard Bureau.  As noted above, Alsup introduced

Winterling to Karen McGinnis, and McGinnis directed that CS be hired shortly

thereafter, a few months after HAMMER first contracted with SHC.  Every single

description of work submitted with a CS invoice reflects CS contacts with, and

solicitation of business from, NGB.  The very first description of work submitted by CS

relates that CS developed an informational packet designed to convince CST

commanders to use HAMMER.  Since CSTs are federally funded, the very first invoice

from CS reflected illegal activity.

53.    The description of work accompanying CS's October 15, 2005, invoice

reflects a meeting in CS's office in Virginia with "senior HAMMER personnel" to

discuss and agree on the approach to NGB.  The same description of work also reflects a

"Meeting with Senate Armed Services staff to initially discuss Hammer and the training

concept."

54.    Subsequent statements of work reflect further development of the plan to

solicit contracts from NGB.  A few examples are:

- A meeting on October 18, 2005, in Virginia with McGinnis, Karnofski, and Alsup
  to develop the strategy;

- A series of meetings on December 5-8, 2005, in Washington, D.C., attended by McGinnis and Karnofski, including a meeting with an NGB training officer who "gave us several suggestions regarding marketing to the Guard;"

- A meeting on January 23, 2006, between CS and NGB officials in which they discussed, among other things, FY06 and FY07 funding.

55.    The description of work accompanying CS's March 15, 2006, invoice contains the following paragraph:

> On February 27, Grayson and Ed met with Randy Krug of J-7 to further discuss/refine/review the National Guard Training Initiative. The objective of the meeting was to insure that any telephonic or written documents coming from the National Guard Bureau were either authored by Randy or approved by him. Further, we wanted to insure that Colonel Ted Mickevicius was kept informed because of his daily contact with The Director, LTG Blum. Randy will manage the training initiative, and the plan is to have him issue a contract to HAMMER, and then inform the CSTs that they should make arrangements to train at HAMMER; and the National Guard Bureau would fund their training up to a specific dollar amount.

56.    That same description of work relates that, about a week later, CS met with Alsup, McGinnis, and Karnofski to discuss CS's "DC efforts."  That entry then says:

> We decided that Karen would ask Congressman Dicks to call LTG Blum and asked him to send someone (Randy) to visit HAMMER, and to encourage General Blum to formally include HAMMER in the training plans for the CSTs and CERFPs.

57.    The description of work for the June 15, 2006, CS invoice reflects a meeting in Virginia between CS, Alsup, McGinnis, and Karnofski to "refine our message to the National Guard, as well as the, our message [sic] to state Congressional delegation, and the Washington TAG."

58.    The description of work for the December 30, 2006, invoice contains the

following:

> In early DEC senior HAMMER personnel came to Washington, DC for a
> series of meetings. Carolyn Alsup accompanied the HAMMER personnel
> to meetings with staff from Congressman's Dicks' and Senator Murray's
> office. The purpose of these meetings was to give an update regarding the
> CST STEP. Both meetings went well. Both staffers indicated a willingness
> to engage the National Guard Bureau if any funding issues were to surface.

59.    The efforts of CS, SHC, and HAMMER to win work from NGB were

ultimately successful.  Lest there be any doubt about the nature of the services being

provided by CS and SHC, CS and HAMMER actually drafted the statement of work for

the NGB contract.  The description of work for the December 30, 2006, invoice contains

the following:

> Over a period of a few days, we reviewed the draft statement of work for
> the CST STEP and provided comments back and forth to HAMMER
> personnel. Upon agreement, the draft statement of work was submitted to
> LTC Lynn, J7, NGB on 8 DEC. The draft statement of work is attached.

> Grayson Winterling met with LTC Lynn and MAJ Stewart on 20 DEC
> regarding the draft statement of work. They appeared to be in agreement.
> They plan to further review the statement and use it as the bases for
> obtaining the release of program funding. It is anticipated the funds could
> be available to HAMMER in the JAN 2007 time frame.

60.    CS, SHC, McGinnis, and Karnofski also repeatedly discussed funding

through Congressional appropriations.  The description of work accompanying CS's

August 31, 2008, invoice contained the following:

COMPLAINT -                                  22

Participated, along with Carolyn Alsup, in a conference call with Karen,
Gary and Lee regarding the HAMMER strategic plan for FY 09. Issues
discussed:

FY 09 DOE Funding—FY 10 DOE Funding
FY 09 DOD-National Guard Funding, including the possibility of bridge
funding and designation of HAMMER as a Regional Training Center.
MSC new contractor
DHS Training Consortium Relationship with FLETC, including FLETC
trained independent agencies

Similar entries appear in descriptions of work for the September 30, 2008, November

30, 2008, December 30, 2008, and January 31, 2009, CS invoices.

61.    CS's descriptions of work even reflect an attempt to lobby Senator Byrd of

West Virginia to include a line item in the Defense appropriations bill for CST training.

The description of work for the March 31, 2009, invoice contains the following:

Had discussions with Russ Crane, Commander Joint Interagency Training
Center-East (JITC-E), regarding the FY 11 POM issue. Colonel Crane is
concerned that without a line item in the budget, the long term viability of
CST training at JITC-E, as well as, at HAMMER is in jeopardy. We
discussed several courses of actions for having the CST STEP included in
the FY 11 POM. Below are two actions that appear to have the greatest
probability of success; WVA National Guard will execute both actions:

• WVA National Guard would ask Senator Byrd to add money to the FY 10
  Defense Appropriations bill with report language that states the money must be
  used for CST sustainment training.

• Since Senator Byrd is also on the Senate Armed-Services, have the WVA
  National Guard also ask him to add language in the FY 10 Defense
  Authorization bill that authorizes the FY 10 money and states that the
  committee expects NGB to include line item funding in the FY 10 and beyond
  budget requests.

COMPLAINT -                        **23**

Additionally, both Colonel Crane and HAMMER will continue to try to convince NGB to include CST sustainment training in their FY 11 budget request to the Army.

This completely illegal plan to lobby the author of the Byrd Amendment for a specific appropriation did not bear fruit because the West Virginia National Guard did not come through.

62.    CS's descriptions of work show repeated discussions with federal officials concerning Congressional funding and using NGB for bridge funding when Congress failed to pass the Defense appropriations bill before the start of the fiscal year. Statements of work for the following invoices reflect such discussions: February 15, 2006; September 15, 2006; September 30, 2006; in 2007, the months of January, July, September, October, November, and December; in 2008, the months of January, February, March, May, September, October, November, and December; in 2009, the months of January, March, April, May, June, July, August, September, November, and December; in the months of 2010, January, February, and March (the last month before MSA started paying CS invoices with corporate instead of appropriated funds).

63.    CS even hired a former Chief of Staff of the National Guard Bureau specifically to lobby NGB, as reported in the description of work for the October 31, 2009, CS invoice.  The description of work for the November 30, 2009, contains the following:

As reported last month, retained the services of MG (ret) Terry Scherling, former Chief of Staff, NGB to explore two issues at the General office level within NGB and the ARNG [Army National Guard]; Regional Training Centers and POM funding for CST sustainment training.

"POM funding" refers to the process by which the Department of Defense puts together the President's DOD appropriations requests for submittal to Congress.

64.    The previous paragraphs are far from exhaustive in setting forth the illegal activities described in the CS and SHC invoices.  They do, however, make it clear that the **only** reason Karen McGinnis hired SHC and CS was to solicit contracts from NGB, DHS, and other federal agencies or federally-funded entities, and to lobby Congress. That is what CS and SHC did, as did McGinnis and Karnofski.  These activities are described in every invoice and accompanying description of work, from the first ones submitted in 2005 to the last one funded in 2010 with federal dollars.

## 7.    Relator's Attempts to Remedy the Situation in the Face of Threats and Abuse

65.    As noted above, Relator's insistence that CS and SHC document their work did not endear Relator to her superiors.  Over the course of the next several years, Relator repeatedly raised the issue of whether the contracts were illegal and sought permission to obtain a legal opinion.  At every turn, she was rebuffed, threatened, and abused.

66.     In response to Relator's attempts to ensure that payment of the CS and SHC

contracts with appropriated funds did not violate the law, Relator's supervisors engaged

in conduct that would have dissuaded a reasonable worker from raising this issue.  In

fact, Relator's supervisors' conduct was designed to dissuade Relator from raising or

reporting the illegality of the CS and SHC contracts.

67.     At the start of fiscal year 2007 (October 1, 2006), Congress had not passed

the DOE appropriations bill so DOE was operating on a continuing resolution.  Fluor

sent out instructions that only priority contracts were to be awarded or extended.

Because she was becoming increasingly concerned about the legality of the CS and SHC

contracts, Relator took the contracts off the priority contract listing for HAMMER in an

effort to stop them.   Karen McGinnis ordered them back on the list and, at her direction,

new contracts were awarded.

68.     Prior to her retirement, the manager of the Business Management and

Strategic Planning organization, Nadine Highland, told Relator that Highland had issued

strongly worded warnings to both McGinnis and Karnofski about the use of the

"consultants."   She also told Relator that she warned Karnofski, who replaced her as

manager of the group, that he was at risk on both contracts.

69.     After Highland's departure in 2008, Relator reviewed the work descriptions

accompanying the CS and SHC invoices because of her increasing unease with the

contracts. After a departure in Fluor Hanford's legal department, Relator was left

without anyone with whom to informally consult on legal matters and so started

conducting her own research into restrictions on use of appropriated funds. It was only

at this point that Relator learned of the relationship between CS and SHC and that the

companies were registered lobbyists.

70.    In response to Relator's raising the illegality of the contracts, Relator was

instructed that she was not to enter Karen McGinnis's office area even though Relator's

office was adjacent to McGinnis's office. This was in violation of both FH and MSA's

official Open Door Policy which was to promote and facilitate communication between

management and employees. McGinnis rarely would speak directly to Relator, insisting

on going through intermediaries for any communications.

71.    In 2008, Karnofski recommended Relator for a bonus. McGinnis promptly

rejected it.

72.    Relator  twice asked Gary Karnofski to allow Relator to obtain a legal

opinion regarding the contracts or, at the very least, talk to Fluor Hanford's corporate

government affairs personnel. Both requests were strongly denied as being "not

necessary". The issues regarding these contracts were the only occasions during

Relator's 26 years of government contracts-related employment that she had been denied

the opportunity to seek advice from company attorneys about a matter. This was no

small point because one of the essential responsibilities of Relator's job was to ensure

that Fluor Hanford, and then MSA, complied with applicable law and regulations.

73.    Relator had an independent obligation under Fluor Hanford's and MSA's

ethics policies to act consistently with applicable law and regulations and to ensure that

Fluor Hanford and MSA did so as well.  Fluor Hanford and MSA Legal and Ethical

Conduct policies (MSC-RD-10348) provided that if employees believed "standards of

conduct, laws or government regulations are not being met or observed are expected to

report the circumstances to their supervisors or any level of management."

74.    Between June 2008 and October 2009, Relator repeatedly told Gary

Karnofski that she believed that believed that the CS and SHC contracts were illegal.  In

October 2009, Relator sent an email to Karnofski stating: "I'll repeat myself again, the

Congressional Strategies and Secure Horizons contracts are in violation of clause H-32

of the MSA (and previously FH) contracts which prohibits using appropriated moneys

for lobbying efforts.  They are also in violation of other FAR clauses and federal laws."

75.    In response to Relator's email, Karnofski told Relator that he had again

relayed Relator's concerns to McGinnis.  He added that "it is Karen's project and

Karen's money and she can do what she wants."  He told Relator that if Relator wanted

to be employed, Relator needed to keep her concerns to herself.

76.    Approximately one week later, Karen McGinnis came to Relator's office. She told Relator that the latter's opinions were not appreciated and stated: "You need to learn to keep your mouth shut or I'll fire you and make sure no one ever hires you again."

77.    Relator's husband was unemployed at that time and so Relator kept her mouth shut as instructed. However, in December 2009, determined to get an opinion on whether the activities of CS and SHC constituted lobbying, Relator contacted the local office of the Inspector General for DOE. She spoke to an investigator in the office without disclosing any of the particular facts of the situation. The investigator informed Relator that paying for lobbying with appropriated funds was, indeed, a violation of the law.

78.    These actions by Relator's superiors caused Relator significant stress and this stress exacerbated other physical problems Relator was having at the time.

79.    In April 2010, Relator discovered that the file containing the monthly reports from Congressional Strategies had been removed from Relator's file drawer. Relator scoured her 17 file drawers of contract information for two days searching for the folder without success. Relator kept her files by year and in alphabetical order and maintained an index of the files on an Excel spreadsheet. Relator had never lost a file in 13 years of being responsible for contracts and no other file was missing. Relator

COMPLAINT -                              **29**

UNDER SEAL                    UNDER SEAL                    UNDER SEAL

repeatedly searched for the folder during Relator's remaining months at HAMMER, always without success.

80.    In July 2010, Defendants' intentional negative and hostile actions against Relator ultimately compelled Relator to leave HAMMER and take another position. The reaction of her supervisors to Relator's attempts to ensure compliance with the law, including - overt hostility from McGinnis, McGinnis's demeaning refusal even to talk to Relator, threats to fire Relator and ensure she could not work elsewhere, the refusal to permit Relator to seek legal advice, and McGinnis's refusal to award Relator a bonus recommended by Relator's immediate supervisor—intentionally overwhelmed Relator and caused her significant emotional and mental distress.  These actions by Defendants were such that a reasonable employee would feel compelled to resign.

## 8.    Changing the CS and SHC Contracts to Non-Reimbursable Contracts

81.    In June of 2009, following the announcement of award to MSA, Gary Karnofski told Relator that Karen McGinnis was concerned that MSA wanted to use their own corporate level lobbyists (Karnofski's word) in Washington, D.C.  He said McGinnis was concentrating on convincing Steve Hafner, the new MSA Vice-President with responsibility for HAMMER, to use CS and SHC, rather than Lockheed's lobbyists, since the former had experience with HAMMER issues.  McGinnis's goal was

COMPLAINT -                              30

to have CS and SHC paid with corporate funds instead of with DOE appropriations as had theretofore been the case.

82.    On January 26, 2010, Karnofski told Relator that, as of April 1, 2010, MSA corporate had agreed to fund the CS contract as a non-allowable cost. Karnofski further related that part of SHC's work would continue to be funded with HAMMER appropriated funds and part with corporate funds. Karnofski said that, following conversations with senior MSA personnel, there would be no effort to change the previous year's unallowable costs.

83.    On March 22, 2010, Karnofski and Realtor met with Rich Meyer, MSA Supply Chain manager, and Dana Worthington, manager of subcontracts and purchasing to discuss the transition of the CS and SHC contracts to non-appropriated moneys. Meyer directly asked Karnofski what CS and SHC were currently doing that made the contracts reimbursable under the DOE contract. Karnofski told Worthington and Meyer that CS and SHC did not lobby and did not attend meetings, referring to meetings between HAMMER personnel and members of Congress, their staff, and executive branch personnel. This was not true, as is obvious from the excerpts above from CS's and SHC's work descriptions accompanying the CS and SHC invoices. Later in the same meeting, Worthington opined that the current work scope in the contracts did not appear to be reimbursable.

84.    On April 1, 2010, the contracts between MSA, CS, and SHC were changed to provide for payment out of corporate rather than appropriated funds.  However, notwithstanding the clear understanding expressed by MSA personnel that the contracts could not be funded by appropriations, the contract between MSA and SHC was divided, with part of SHC's work continuing to be submitted for reimbursement by DOE out of appropriated funds.

### 9.    Defendants' Illegal Use of Appropriated Funds

85.    Congressional Services and Secure Horizons Consulting were hired by Karen McGinnis to lobby Congress and federal agencies for additional business for HAMMER.  CS and SHC were paid with DOE and DOD appropriations.  It is illegal to attempt to influence officers or employees of federal agencies, Members of Congress, officers or employees of Congress, or employees of a Member of Congress in connection with the making and extension, continuation, renewal, amendment or modification of federal contracts.  All of the efforts of CS and SHC were directed at obtaining federal contracts or changes thereto for HAMMER.

86.    The National Guard Bureau is part of the U.S. Department of Defense. NGB's operations are funded by federal appropriations in the Defense Appropriations Act and, in recent years, supplemental appropriations by Congress, mostly in connection with the wars in Afghanistan and Iraq.

COMPLAINT -                          **32**

87.    Pursuant to Congressional directive, NGB provides personnel, equipment, and training for Civil Support Teams ("CSTs") created to respond to biological or chemical attacks in the U.S.  The CSTs are funded entirely with federal dollars.  NGB contracted with HAMMER to provide training to CSTs by way of a Military Interdepartmental Purchase Request ("MIPR") between NGB and DOE.

88.    On February 13, 2008 (signed by authorizing official on February 15), NGB issued a MIPR in the amount of $1,000,000 to DOE for CST training at HAMMER.  The MIPR and its attached statement of work described the work as follows:

> The work being funded is Congressionally directed at achieving Homeland
> Security Objectives.  Specifically, this program will be designed to sustain
> the perishable and critical skills of the CSTs as provided for in the National
> Defense Authorization Act for FY 2008, and focus on providing
> standardized, realistic, and challenging event scenarios to ensure consistent
> and coordinated response capabilities for CSTs.

89.    The Federal Law Enforcement Training Center ("FLETC") provides federal law enforcement training to more than 80 federal agencies with law enforcement responsibilities.  FLETC is funded by Homeland Security Department appropriations.

90.    Fluor Hanford, and subsequently MSA, operated HAMMER as part of the larger Hanford Site DOE prime contracts.  The DOE primary contract was funded entirely with federal appropriations.

COMPLAINT -                                33

91.     Accordingly, CS, SHC, and HAMMER management's lobbying of NGB,

DHS, FLETC, and Congress all constituted attempts to influence federal agencies and

Congress with respect to the making and extension, continuation, renewal, amendment

or modification of federal contracts.

### 10.     Payments to CS and SHC with Appropriated Funds

92.     The amount paid to SHC using appropriated funds, from the initiation of

the original contract with SHC through March 2010, was $278,148.43.  Each time SHC

submitted an invoice to Fluor or MSA, which Fluor or MSA then submitted for payment

or reimbursement under the prime contract with DOE, SHC and Fluor and/or MSA were

required to certify compliance with the Byrd Amendment.  Each such certification was

false and thus constituted a false claim under the False Claims Act.

93.     The amount paid to CS using appropriated funds, from the initiation of the

original contract with CS through March 2010, was $398,164.16.  Each time CS

submitted an invoice to Fluor or MSA, which Fluor or MSA then submitted for payment

or reimbursement under the prime contract with DOE, CS and Fluor and/or MSA were

required to certify compliance with the Byrd Amendment.  Each such certification was

false and thus constituted a false claim under the False Claims Act.

94.     The salaries of Karen McGinnis and Gary Karnofski while they have been

employed at HAMMER have at all times been paid with appropriated funds.  While the

COMPLAINT -                    34

amount of the McGinnis's and Karnofski's salaries attributable to their work with CS and

SHC, and their illegal lobbying, is not known at this time, each time Fluor or MSA then

submitted, under the prime contract with DOE, a request for payment or reimbursement

that included McGinnis's and Karnofski's salaries, Fluor and/or MSA were required to

certify compliance with the Byrd Amendment. Each such certification was false to the

extent that McGinnis and/or Karnofski received salary for lobbying during the relevant

period and thus constituted a false claim under the False Claims Act.

## COUNT 1 - FALSE CLAIMS ACT

95.    Relator repeats and realleges each allegation contained in paragraphs 1

through 94 above as if fully set forth herein.

96.    This is a claim by Relator, on behalf of The United States of America, for

treble damages and penalties under the FCA, 31 U.S.C. §§ 3729 *et seq.*,, against

Defendants for knowingly causing to be presented false claims to the United States

Department of Energy. From in or about 2005 through at least April 2010, in the Eastern

District of Washington, Defendants have knowingly and willfully presented and caused

to be presented false claims.

97.    Defendants have presented and caused to be presented claims for payment

to the United States Department of Energy, knowing such claims were false.

## COUNT 2 – PROHIBITED DISCRIMINATION UNDER 31 U.S.C. § 3730(h)

98.    Relator repeats and realleges each allegation contained in paragraphs 1 through 97 above as if fully set forth herein.

99.    As described above, Relator's supervisors engaged in conduct that would have dissuaded a reasonable worker from raising concerns.  Defendants harassed, limited the job duties of, denied the Relator earned her earned bonus, and otherwise discriminated in the terms and conditions of employment against Relator, including promoting and maintaining a hostile work environment against her, because of lawful acts done by her in furtherance of action under the False Claims Act, in violation of 31 U.S.C. § 3730(h).  Defendants' harassment of Relator and creation of a hostile work environment against Relator was motivated in whole or in part by a desire to discriminate against her for her protected disclosures.   Defendants failed to remedy said hostile work environment despite their knowledge of it.

100.    Because of her protected disclosures, the Defendants subjected her to a continuous pattern of harassment, threats, and a hostile work environment that led to her constructive discharge. Defendants created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have found continued employment intolerable and would have been compelled to resign.

COMPLAINT –                              36

101. Because of the Defendant's conduct, Plaintiff has suffered economic

damages, lost income, career damage, and non-economic damages for emotional

distress.

WHEREFORE, Relator respectfully requests this Court to enter judgment

against Defendants as follows:

As for Count I:

(a) Awarding the United States damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.*, provides;

(b) Imposing civil penalties of $10,000 for each and every false claim that Defendants caused to be presented to the United States Department of Energy;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) Awarding Relator the maximum amount allowed pursuant the False Claims Act;

(e) Such other and further relief as the Court deems proper.

As for Count 2:

(a) Reinstating Relator to her employment with the same seniority status Relator would have had were she not terminated;

(b) Granting Relator equitable economic relief including for any lost bonus or back pay, front pay, lost benefits and interest thereon;

(c) Granting Relator an additional statutory amount equal to back pay, lost benefits and interest thereon;

(d) Granting Relator damages at law for lost income and benefits, and career damages that Plaintiff has and will continue to suffer, in an amount to be set by a jury;

(e)  Granting Relator damages at law for emotional distress, embarrassment and anxiety in an amount to be set by a jury, but not less than $500,000;

(f)  All other relief provided for under the law or that the Court deems proper

DATED this 18th day of February, 2011  Respectfully submitted,

_____/s/_____

Stephani L. Ayers WSBA #31610
T.M. Guyer and Ayers & Friends, P.C.
116 Mistletoe St.
P.O. Box 1061
Medford, OR 97501
Ph: 813 382 7865
Fax: 1.888.866.4720
Email: Stephani@whistleblowerdefenders.com

Geoffrey Bestor, Esq., *Pro Hac Vice forthcoming*
4204 Maple Terrace
Chevy Chase, MD 20815
240-463-8503
gbesq@bestorlaw.com